UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

                                              Chapter 7

Cherie Ann Hlady *dba* Hlady Law Firm, PC,

                                              Case No.: 8-16-74011-las

                        Debtor.
-----------------------------------------------------------------X
Cherie Ann Hlady,

                            Plaintiff,             Adv. Pro. No.: 8-16-08181-las

     against

Key Bank N.A., American Education Services,
Citibank, N.A., Citibank Student Loan
Company, and New York State Higher
Education Services, Corp.,

                            Defendants.
-----------------------------------------------------------------X

<u>MEMORANDUM DECISION AFTER TRIAL</u>

Plaintiff Cherie Ann Hlady commenced this adversary proceeding seeking the discharge of her student loan debt to Educational Credit Management Corporation ("ECMC")[1] under 11 U.S.C. § 523(a)(8)[2]. That section excepts student loan debt from discharge "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Plaintiff argues that repayment of the loan, i.e., excepting the debt from discharge, will impose an undue hardship on her. Specifically, plaintiff asserts that she satisfies the three-prong test set forth by the Second Circuit Court of Appeals in *Brunner v. N.Y. Higher Educ. Servs. Corp.*, 831 F.2d 395

---

[1] ECMC, a federal student loan guarantor in the Federal Family Education Loan Program, holds an interest in one (1) consolidation loan owed by plaintiff. Defendant New York State Higher Education Services Corporation assigns to ECMC for defense its student loan accounts that are in bankruptcy. *See* Answer filed by ECMC, n.1 [dkt. no. 9].

[2] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will hereinafter be referred to as "§ (section number)".

(2d Cir. 1987) for determining the existence of "undue hardship", thus establishing that the student loan debt at issue is dischargeable. In brief, under the three-prong *Brunner* test, a claim of "undue hardship" turns on the following questions (i) whether a debtor, based on her current finances, can repay her student loan obligation and still maintain a minimal standard of living, (ii) if she does not have the present ability to repay her student loan obligation and, at the same time, maintain a minimal standard of living, whether that inability will persist for a significant portion of the repayment period, and (iii) whether the debtor has made a good faith effort to repay her student loan obligation. Additionally, under existing Second Circuit precedent, a debtor bears the burden of proving each element of the *Brunner* test by a preponderance of the evidence.

For its part, ECMC contends that plaintiff falls short of satisfying each prong of the *Brunner* test. In its view, plaintiff has not made any effort to maximize her income nor has she taken any steps to minimize her current expenses. Additionally, ECMC maintains that plaintiff is eligible for any of three income-based repayment programs under which her monthly payment would be $0 for a period of 25 years based upon her most recent federal income tax return. Plaintiff does not contest the amount she would be required to pay under the income-based repayment programs, nor does she challenge the nature of the debt owed to ECMC as an educational loan under § 523(a)(8)(A)(i), or the amount owed as of the time of trial.

The Court has subject matter jurisdiction under 28 U.S.C. § 1334 and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012. A proceeding to determine the dischargeability of debt is a core proceeding that the Court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

Having considered the parties pre and post-trial submissions and the evidence presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, as made applicable here by Bankruptcy Rule 7052. To the extent a finding of fact includes a conclusion of law, it is deemed a conclusion of law, and vice versa. For the reasons set forth below, the Court finds that plaintiff has failed to carry her burden of establishing that repayment of her student loan debt to ECMC would constitute an undue hardship under § 523(a)(8). Accordingly, the Court enters judgment for ECMC.

## PROCEDURAL BACKGOUND

Plaintiff filed for chapter 7 relief on August 31, 2016 and thereafter commenced this adversary proceeding seeking a determination of the dischargeability of her student loan. [dkt. no. 1]. ECMC filed an answer to the complaint. [dkt. no. 9]. In its answer, ECMC stated that it is the proper party in interest in the adversary proceeding and that it would seek to intervene. *See* Answer, n.1 [dkt. no. 9]. That statement is consistent with ECMC's letter [dkt. no. 10] filed pursuant to this Court's Pretrial Conference Order [dkt. no. 4]. ECMC did not move to intervene in the adversary proceeding pursuant to Rule 24 of the Federal Rules of Civil Procedure, made applicable here by Bankruptcy Rule 7024. However, plaintiff has not contested ECMC's standing as the proper party defendant in this adversary proceeding. The parties filed a joint status letter [dkt. no. 14], conducted extensive fact discovery, filed a joint pretrial memorandum [dkt. no. 21] and participated in a two-day trial before the Court, all without a challenge by plaintiff to ECMC's assertion that it is the proper party defendant.

In anticipation of trial, the Court entered a Pre-Trial Order setting forth the deadline for submission of witness lists, a joint exhibit book, and any stipulations or agreed statement of facts or law to which all parties consent. [dkt. no. 18]. In accordance with the Pre-Trial

Order, the parties timely submitted a joint pretrial memorandum which listed plaintiff as the only trial witness, listed the exhibits to be offered by each party on its respective case-in-chief, and set forth the parties' stipulated facts and agreed statements of law. [dkt. no. 21]. The Court conducted a two-day trial at which only plaintiff testified. Following the trial, at the direction of the Court, the parties submitted proposed findings of fact and conclusions of law. [dkt. nos. 30, 35].

## FINDINGS OF FACT

The following findings of fact are based on the trial record, which include the trial testimony, exhibits entered into evidence, and the parties' stipulation of certain facts.[3]

A.  Stipulated Facts

Plaintiff is an individual residing at 7 Dorothy Street, Hicksville, NY. [JPM ¶ 4.] Plaintiff is 48 years old. [JPM ¶ 5.] Plaintiff is married and has no dependents. [JPM ¶ 6.]

ECMC is a not-for profit corporation duly organized under the laws of the State of Minnesota, with offices located at 111 South Washington Avenue, Suite 1400, Minneapolis, Minnesota 55401. [JPM ¶ 1]. ECMC, a federal student loan guarantor in the Federal Family Education Loan Program ("FFELP"), holds an interest in one unpaid student loan pertaining to plaintiff (the "ECMC Loan"). [JPM ¶ 2]. As of January 23, 2017, the outstanding balance of the ECMC Loan, including principal, interest, fees and costs, was approximately $140,772.91. [JPM ¶ 3]. The ECMC Loan accrues interest at a rate of 6.88% per annum, or $19.69 *per diem*.  [JPM ¶ 3].

Plaintiff obtained the ECMC Loan for the purpose of financing her pursuit of a Juris Doctorate degree from Hofstra University, which she obtained in 2006. [JPM ¶ 7]. In addition

---

[3] The parties stipulated to certain facts in their Joint Pre-Trial Memorandum [dkt. no. 21]. For convenience, the Court will refer to the stipulated facts as "JPM ¶ __". Additionally, "Tr." refers to the transcript of the trial in this matter which appears at dkt. nos. 26 (October 2) and 27 (November 15), and "Ex." refers to the trial exhibits (*see* JPM, Part IV. Trial Exhibits).

to her Juris Doctorate degree, plaintiff also holds a bachelor's degree in Speech from St. John's University. [JPM ¶ 8]. Plaintiff is licensed to practice law in the State of New York [JPM ¶ 9], has worked as an attorney and legal assistant since 2006 [JPM ¶ 10], and is a Notary in the State of New York [JPM ¶ 11]. Plaintiff maintains her own law practice, Hlady Law Firm, PC, where she handles all legal and administrative tasks, and her law practice includes real estate and estate planning. [JPM ¶ 12]. Plaintiff is able to drive. [JPM ¶ 13].

Plaintiff is eligible to enter the William D. Ford Direct Loan Consolidation Program (the "Ford Program") or avail herself of options under the FFELP in order to achieve greater flexibility in repaying the ECMC Loan. [JPM ¶ 14]. If plaintiff entered into the Ford Program, her monthly payment under the Income Based Repayment Program option would be $0, based on her reported household adjusted gross income ("AGI") of $321, as reported in plaintiff's 2016 federal income tax return. [JPM ¶ 15]. If plaintiff entered into the Ford Program, her monthly payment under the Income Contingent Repayment Plan option would be $0 for a period of 25 years, based on her reported AGI of $321, as reported in plaintiff's 2016 federal income tax return. [JPM ¶ 16]. If plaintiff entered the Revised Pay As You Earn Plan, her monthly payment would be $0 for a period of 25 years, based on her reported AGI of $321, as reported in plaintiff's 2016 federal income tax return. [JPM ¶ 17]. Under any of her income-driven repayment options, plaintiff would be required to submit documentation regarding her income every year of the duration of the loan in order to remain in that option. [JPM ¶ 18]. ECMC has apprised plaintiff of her various loan repayment options. To date, plaintiff has declined to accept any of those options. [JPM ¶ 19].

Plaintiff's monthly expenses include cellular phone service for two separate phone numbers, at a cost ranging from $131.07 to $160.43 per month. [JPM ¶ 20]. Plaintiff's monthly expenses also include bundled cable television, telephone, and internet at a cost of $223.07 per month. [JPM ¶ 20].

B.  Trial Testimony

Upon graduation from law school in 2006, plaintiff owed approximately $40,000 on her student loans. [10/2 Tr.7:13-14] [dkt. no. 26]. At the time of trial, plaintiff's student loan debt exceeded $130,000. [*Id.* 7:15-17].[4] After graduating from law school, plaintiff worked for the law firm of Fratello & Fox PC in Woodbury, New York as a legal assistant earning $25 an hour. [*Id.* 8:2-7]. After plaintiff passed the bar exam, the firm continued to pay her $25 an hour but did increase plaintiff's responsibilities. [*Id.* 8:9-11]. Plaintiff testified that she would be laid off by the firm whenever the workload for the attorney she worked for was slow or if the attorney's daughters were home from school as they would handle nonlegal aspects of plaintiff's job while the attorney would do all the legal work. [*Id.* 9:1-8].

Plaintiff stopped working for the firm after she was injured in an automobile accident in early June of 2011. [*Id.* 9:13-21]. Plaintiff testified that she used a headhunter, sent out hundreds of resumes and went on a few job interviews. [*Id.* 9:17-19]. Plaintiff did not testify as to the places she sent her resumes, the firms with whom she interviewed, and the time frame of her job search. Nor is there any documentary evidence in the trial record showing the extent of plaintiff's job search.

Plaintiff testified that she used to wait tables and bartend, but she can no longer stay on her feet for an extended period. [*Id.* 19:13-14]. While plaintiff testified that she has chronic issues and thus cannot supplement her income, she did not explain the nature of any chronic issue nor did she offer any documentary evidence to corroborate this claim. [*Id.* 19:14-15]. Plaintiff did, however, testify that "lawyering" is okay. [*Id.* 19:15]. She testified that while she can't sit for an extended period, if she can stand up, she's okay. [*Id.* 19:15-16]. There is

---

[4] In her Amended Schedule E/F (Creditors Who Have Unsecured Claims), plaintiff listed a debt to the New York State Higher Education Corporation in the amount of $130,305. *See* dkt. no. 13 in the underlying bankruptcy case, *In re Hilady*, Case No. 16-74011. References to docket entries in the main bankruptcy case will be noted as "Bankr. dkt. no. __".

nothing in the record, no testimony or documentary evidence, to support her claim that she is unable to stand or sit for an extended period because of any medical condition. Additionally, plaintiff did not explicitly ask that her unspecified chronic issues be taken into consideration in determining whether her student loan debt should be discharged. As noted above, plaintiff testified that she can practice law [*Id.* 19:15] and, as noted below, plaintiff testified that she shovels snow [*Id.* 26:3-6].

At the end of October 2011, plaintiff decided to start her own law practice. [*Id.* 11:1-2]. In her private practice, she does wills, trusts and estates, and real estate closings. [*Id.* 11:5-9]. She has not actively pursued legal work and gets business by word of mouth. [*Id.* 19:21-22]. Plaintiff testified that she doesn't have money for a law firm website or advertising. [*Id.* 19:20-21]. She testified that she has not sought employment as a per diem contract attorney as she prefers to either have her own law practice or work for a law firm as a W-2 employee. [*Id.* 64:19-21]. As to the latter, plaintiff did not offer any evidence that she sought alternative employment at a law firm after starting her own practice.

According to plaintiff's 2011 Federal income tax return, she earned $9,658 in gross revenues from her legal practice and, after business expenses, her net business income was $6,188. [Ex. I]. Plaintiff incorporated her legal practice in 2012. [10/2 Tr. 10:23-24.] According to plaintiff's 2012 Federal income tax return, her 2012 gross revenue from her law practice, Hlady Law Firm PC, was $8,867. [*Id.* 33:23-25, 34:4-8; Ex. H]. Her net profit for that year was $5,894. [Ex. H]. Plaintiff reported gross revenue of $1,075 in her 2013 Federal income tax return [*Id.* 33:14-17; Ex. G], and a net profit of $559. [Ex. G]. In her 2014 Federal income tax return, plaintiff reported gross revenue of $34,231 and a net profit of $17,691. [Ex. F]. In her 2015 Federal income tax return, plaintiff reported gross revenue of $29,431 and a net profit of $12,784. [Ex. E]. In her 2016 Federal income tax return, plaintiff reported gross

revenue of $14,152 and a net profit of $321. [Ex. D]. Plaintiff testified that she grossed approximately $1,000 to $1,200 a month in 2017. [10/2 Tr. 15:18].

Plaintiff operates her legal practice from her home. [*Id.* 15:25, 16:1]. She does not own the home, rather the home is owned by plaintiff's mother, Priscilla Hlady, and was inherited by her mother from plaintiff's grandparents. [*Id.* 18:9-10]. Plaintiff's mother used to rent out the house, but plaintiff moved into the house in the summer of 2005 during her third year in law school. [*Id.* 18:8-11]. Plaintiff's parents live a block and a half away. [*Id.* 25:13]. While plaintiff does not pay rent to her mother, she testified that she pays the real estate taxes on the house directly to the town. [*Id.* 24:15-21]. Plaintiff testified that the school taxes are about $22,070 and general taxes are about $1,809 a year. [*Id.* 16:1-2]. That would average about $2,000 a month. However, plaintiff testified that her payment of the real estate taxes results in a "rental" cost of $700 a month. [*Id.* 16:5-6]. Plaintiff did not offer any explanation for the inconsistency in her testimony and did not proffer any documents in support of her living arrangement, nor is there any documentary evidence in the trial record corroborating her payment of the real estate taxes and the amount of the payment. Plaintiff testified that her mother pays for landscaping for the property, but plaintiff does the snow removal on her own by taking out the shovel. [*Id.* 26:3-6]. Plaintiff stated that she pays for utilities and any repairs to the house. [*Id.* 25:18-21]. Her heating bill averages about $200 a month. [*Id.* 16:21-23].

Plaintiff testified that on a monthly basis, she spends about $100 to $150 on food, $25 for housekeeping, $25 on clothing, $25-$40 on personal care such as haircuts, $50-60 for out-of-pocket medical and dental expenses, and $40-$80 for transportation expenses, including car payments, maintenance and gas. [*Id.* 16:24-25; 17:1-21]. Plaintiff also testified that she pays $200 a month for bundled internet, a telephone landline which serves as her office

number, and cable television from Optimum. [*Id.* 16:13-15]. She has not sought to reduce her monthly cable television cost by getting fewer channels. [*Id.* 67:17-20]. If plaintiff removed some of the channels, she would save about $18 a month. [*Id.* 68:1-2]. If plaintiff eliminated her cable television cost and kept just internet and a telephone landline, she would save $30 or $45 a month. [11/15 Tr. 28:7-9, 38:13-15] [dkt. no. 27]. Plaintiff viewed these potential savings as nominal and has not sought to change her subscription with Optimum. [*Id.* 28:1-3].

Plaintiff married in 2014. [10/2 Tr. 19:1-2]. Plaintiff's husband has been living in Colorado since February 1, 2016. [*Id.* 19:23-24]. Her husband does not contribute to plaintiff's household expenses. [*Id.* 19:5-6]. Plaintiff testified that she pays for her husband's car insurance because she has medical coverage under his health plan. [*Id.* 23:15-16; 42:16-17]. No evidence was proffered as to the cost of that medical coverage. In addition to paying for her husband's car insurance, plaintiff has her own car insurance payment of $200 a month. [*Id.* 17:24-15]. Plaintiff also pays for her husband's cellphone plan, again stating that is so because she is covered under his health plan. [*Id.* 42:8-9; 42:21-22]. A review of plaintiff's tax returns shows that in years where plaintiff had enough gross income, she would offset some of her cellphone and on-line computer expenses against her gross revenue as reported on her Federal income tax returns. [Exs. E, F, and H].

Plaintiff maintains a joint checking account and a joint savings account with her mother at TD Bank. [10/2 Tr. 35:17-6, Ex. J; 11/15 Tr. 4:15-21, Ex. K]. She stated that, almost exclusively, the expenses that are listed in the bank statements comprise of her living expenses. [10/2 Tr. 39:8-10]. On cross-examination, plaintiff testified that these expenses include the following. On June 23, 2016, she purchased an Apple watch for $432.33. [*Id.* 78:1-4]. On October 15, 2015, plaintiff purchased a Kate Spade purse for $214 [130:9-12], and on

August 15, 2014, she purchased Kate Spade shoes for $156.42 [*Id.* 135:7-10]. There are also numerous expenses in excess of $100[5] for which plaintiff had no express recollection: (1) $208 debit incurred on May 18, 2016 for Mislanier2 [*Id.* 81:3-5]; (2) $303.00 withdrawn in Denver, Colorado on January 19, 2016, (3) $201.75 withdrawn in Scottsbluff, Nebraska on January 11, 2016 [*Id.* 97:15-21]; (4) $152.36 incurred on Amazon on March 31, 2016 [*Id.* 87:12-15]; (5) $142.62 incurred at Barnes and Noble on December 10, 2015 [*Id.* 103:10-13]; (6) $117.62 debit paid to Honeygirl67 on October 2, 2015 [*Id.* 109:24-25, 110:1]; (7) $635 debit made on January 29, 2015 [*Id.* 122:2-5], (8) $392.15 incurred on January 2, 2015 for wwwfanxchange.com [*Id.* 123:6-8], (9) $207 incurred on November 24, 2014 for RST Restaurant.com [*Id.* 124:9-12], (10) $146 spent on tickets at Nassau Heritage on November 7, 2014 [Id. 127:7-10]; (11) approximately $150 of on-line purchases incurred from October 20 to 21, 2014 at various vendors; (12) $100 paid to Candiebolto on August 18, 2014 [*Id.* 131:9-12], and $120 on August 29, 2014 [*Id.* 131:21-24]; (13) $262 paid to KHarper2003 on July 28, 2014 [*Id.* 133:17-20]; and (14) $146 spent on tickets at Nassau Heritage on April 10, 2014 [*Id.* 138:3-8].

Plaintiff has traveled to Montreal, Canada to attend conferences sponsored by the American Bar Association on international law, an area of law in which she hopes to practice, and to fulfill continuing legal education requirements. [*Id.* 52:6-15, 59:3]. For the conference she attended on October 27, 2015, plaintiff stayed at the Fairmont Hotel in Montreal at a cost of $1,115.77. [*Id.* 104:20-24]. Despite her purported interest in international law, there is nothing in the record evidencing any effort by plaintiff to find employment in this practice area.

---

[5] While the record made at trial and plaintiff's bank statements show numerous expenses under $100, the Court has listed certain expenditures in excess of $100 as brought out on cross-examination.

In September of 2014, plaintiff flew to Denver, Colorado to attend a wedding for a family friend and stayed at The Ritz Carlton where she incurred hotel costs of about $600. [*Id.* 132:8-24]. Plaintiff testified that she has purchased birthday, Christmas and Valentine's Day gifts for her husband, such as comedy show tickets, and diecast for model cars, which total $100 or more for each occasion. [*Id.* 83:1-25, 103:14-17, 120:16-21, 121:11-17, 136:11-16].

On April 7, 2017, plaintiff made a wire transfer of $5,000 to her husband. [*Id.* 55:6-11]. This amount consisted of $1,000 of plaintiff's own funds and $4,000 she borrowed from neighbors, friends and a cousin. [*Id.* 55:15-22]. Plaintiff did not proffer any evidence as to the terms by which she borrowed these funds. According to plaintiff, the funds she gave to her husband were earmarked towards the purchase of a house in Colorado in her husband's name only. [*Id.* 56:11-23]. When the earnest money for the purchase of the house was released, plaintiff's husband used the released funds to pay back his uncle for monies borrowed and to pay off his own student loans. [*Id.* 57:11-21]. Plaintiff's husband made it clear that he was not repaying the $5,000 borrowed from plaintiff [*Id.* 58:20-23]. However, plaintiff told her husband that he needed to give her a $1,000 check that he received from a third party to pay her back the $1,000 that she had given him, which he did. [11/15 Tr. 13:1-7]. Plaintiff had to repay the $4,000 she borrowed from others out of her own earnings or by providing a credit towards future legal services. [10/2 Tr. 58:4-19]. Plaintiff did not proffer any documentary evidence of how much of the purported $4,000 loan she has paid back or what legal services she performed in lieu of having to pay back the borrowed funds.

At the time of trial, plaintiff's mother was 69 years old [*Id.* 36:22-23], and plaintiff's father was 79 years old [11/15 Tr. 32:20]. Plaintiff testified that her mother does not have the use of a credit card. [*Id.* 20:16-17]. She also testified that her mother does not have a computer and relies upon plaintiff to make on-line purchases with plaintiff's debit or credit card, such

as Christmas and birthday gifts for plaintiff's nieces [10/2 Tr. 38: 12-15], and airline tickets for vacation [*Id.* 30:1-3]. Plaintiff's parents have treated plaintiff to a vacation to Disney World in Florida every November for the past 9 years. In 2015, 2016 and 2017, plaintiff and her parents went twice each year to Disney World, once in March and again in November. [*Id.* 89:13-14; 117:8-24]. Plaintiff testified that she would purchase in advance the park tickets and meal plans. [*Id.* 94:7-18; 101:8-11; 117:21-23]. She stated that her parents asked her to make these purchases because she could get a military discount. [*Id.* 117:11-13]. Plaintiff further testified that her parents always reimbursed her in cash for these purchases without fail. [*Id.* 118:15-17]. Usually, plaintiff would hold the cash to pay her living expenses or a prospective bill instead of depositing the funds into her checking account. [*Id.* 118:18-25]. There is no writing or ledger to reflect or memorialize plaintiff's receipt and retention of cash from her parents. [11/15 Tr. 20:8-11].

Plaintiff's husband also asked her to make on-line purchases for him and he would pay her back for these costs. [*Id.* 82:13-25]. Plaintiff testified that some of the funds paid back by her husband were in the form of cash, which plaintiff kept on hand or deposited to her checking account, or payments made using PayPal. [*Id.* 86:22-25, 88:2-3, 92:17-25, 93:1-4, 95: 18-22]. Notwithstanding plaintiff's practice of not depositing cash she received from her husband and parents as reimbursement of expenses incurred on their behalf into her bank account, none of plaintiff's monthly bank statements admitted into evidence for the period January 2013 through June 1, 2017 show a negative balance. [Ex. J].

Plaintiff applied for deferments when her student loans first became due. [10/2 Tr. 11:17-18; 12:4]. Plaintiff testified that she made her first loan repayment in 2009. [11/15 Tr. 45:22-24]. Plaintiff believes she repaid approximately $5,000 on account of the ECMC Loan. [*Id.* 45:17-19]. Plaintiff admitted that she never made regular monthly payments on her

student loan obligation. [*Id.* 49:14-15]. Plaintiff stated that if she did have extra funds on hand, she would send it to ECMC. [*Id.* 41:24-25]. She found one check in her check register where she sent ECMC $500. [*Id.* 48:3-5]. Other than the check register, she does not have or maintain any other check register that reflects or evidences payments she made on account of the ECMC Loan. [*Id.* 48:24-25, 49:1-3]. Plaintiff calculated that she made loan repayments of about $5,000 based upon what interest deductions she claimed for her student loans on her tax returns in a given tax year figuring that she was only paying interest. [*Id.* 48:5-7, 12-19]. Other than her testimony as to claimed interest deductions on her tax returns, plaintiff did not conduct any independent verification to determine the amount of student loan debt she repaid. [*Id.* 48:20-23]. The record is devoid of any evidence as to when plaintiff made any student loan payments or the actual amount of any such payments.

At first, plaintiff testified that she stopped applying for student loan deferments in 2010 and 2011, [10/2 Tr. 12:6-7], and that she has not made any payments since the beginning of 2011. [11/15 Tr. 46:22-25]. Later, she testified that she deferred payment of her student loans in 2006 but didn't think she deferred payment of her student loans in 2007 or 2008. [*Id.* 49:23-24]. Plaintiff stated that she just didn't pay anything during that time [*Id.* 49:24], and her best guess is that she received the first default letter in 2008 or 2009 [*Id.* 49:24-25, 50:1-2]. She testified that she received further default notices after that, but for a long period of time she didn't open the mail from ECMC. [*Id.* 50:3-6].

Plaintiff declined each of the income-based repayment options offered by ECMC even though her monthly payment would be $0 for a period of 25 years based upon her adjusted gross income as reported in her most recent Federal income tax return. [*Id.* 31:2]. Plaintiff testified that she was going to be 49 years old and 25 years of reporting as required under the income-based repayment programs would make her 75 years old when she was done. [*Id.*

31:2-5]. Plaintiff stated that she just wants her student loan debt to be over. [*Id.* 31:15]. She doesn't see any change on the horizon and doesn't see what is going to be different in 10 years that hasn't been the same for the last 10 years. [*Id.* 31:15-17].

DISCUSSION

As noted above, plaintiff seeks to discharge her student loan debt, i.e., the ECMC Loan, pursuant to § 523(a)(8) on the basis that repayment "will impose an undue hardship" on her. Plaintiff claims that she has satisfied each prong of the three-prong test established by the Second Circuit in *Brunner* to determine the existence of undue hardship and her student loan debt must, therefore, be discharged.[6] The Court disagrees. As set forth below, the Court concludes that plaintiff has failed to carry her burden of proof to present evidence in support of her claim that repayment of her student loan debt will impose an undue hardship on her and to prove that claim by a preponderance of evidence.

A. The Legal Framework Governing Undue Hardship: The *Brunner* Test

"Student loans are presumptively nondischargeable in bankruptcy." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 231 (2d Cir. 2012). However, § 523(a)(8), provides for the discharge of student loan debt if "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). "Because any debtor in bankruptcy usually has significant financial problems, a finding of undue hardship will not be based simply on the debtor's difficulty in making payments." *Williams v. N.Y. State Higher Educ. Servs. Corp. (In re Williams)*, 296 B.R. 298, 302 (S.D.N.Y. 2003), *aff'd*, 84 F. App'x 158 (2d Cir. 2004). "A debtor carries a heavy burden when she seeks to establish an undue hardship under [S]ection 523(a)(8)." *Id.* "[Section] 523(a)(8) exhibits a

---

[6] In their joint pretrial memorandum, the parties agreed that plaintiff's claim that her student loan debt to ECMC is dischargeable turns on the question of whether repayment of the loan "would impose an undue hardship" on her, and that the three-prong *Brunner* test is the applicable standard for determining the existence of undue hardship. *See* JPM Part II, ¶ 1.

14

'clear congressional intent . . . to make the discharge of student loans more difficult than that of other nonexcepted debt . . . .'" *Traversa v. Educ. Mgmt. Corp. (In re Traversa)*, 444 F. App'x 472, 474 (2d Cir. 2011) (summary order), *cert. denied*, 568 U.S. 817 (2012) (quoting *Brunner*, 831 F.2d at 396).

While the term "undue hardship" is not defined in the Bankruptcy Code, the Second Circuit in *Brunner* established a three-prong test for determining the existence of "undue hardship". Under the *Brunner* test, to succeed in excepting student loan debt from discharge, a debtor must show: (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for the debtor and the debtor's dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this current state of affairs is likely to persist for a significant portion of the repayment period; and (3) that the debtor has made good faith efforts to repay the loans. *Brunner*, 831 F.2d at 396. A debtor must prove each prong of the *Brunner* test by a preponderance of the evidence.[7] *Traversa*, 444 F. App'x at 474 (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

"Courts consider multiple factors when determining whether the three-pronged *Brunner* test is satisfied, including the debtor's gross income, age, health, dependents, and marital status." *Williams*, 296 B.R. at 302. If the debtor fails to satisfy any one of the three prongs of the *Brunner* test, "the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Id.* (citing *Pa. Higher Educ. Assistance Agency v. Faish* (*In re Faish*), 72

---

[7] "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence . . . ." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137, n.9 (1997) (quoting *Concrete Pipe and Prods. of Cal., Inc. v Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993). "As the finder of fact, the Court is entitled to make credibility findings of the witnesses and testimony." *Merck Eprova AG v. Gnosis S.P.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).

F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009 (1996)). *See also Tingling v. U.S. Dep't of Educ.*, 611 B.R. 710, 724 (E.D.N.Y. 2020).

Although application of the three-prong *Brunner* test has been called into question as being overly harsh and not in keeping with what the Second Circuit originally intended, *see, e.g.*, *Rosenberg v. N.Y. State Higher Educ. Servs. Corp. (In re Rosenberg)*, 610 B.R. 454, 459 (Bankr. S.D.N.Y. 2020), it nevertheless remains binding precedent that this Court must follow. Because the Court agrees with Chief Judge Morris that the *Brunner* test should be applied by the courts "as it was originally intended", *Id.*; *Clavell v. U.S. Dep't of Educ. (In re Clavell)*, 611 B.R. 504 (Bankr. S.D.N.Y. 2020), the question therefore naturally arises: whether, it is consistent with *Brunner*, that a 48-yaer old debtor: (i) who is in good health, (ii) who has no dependents, (iii) who has a solid education - an undergraduate degree in Speech and a Law degree, (iv) who is gainfully employed in her own law practice, (v) who has not presented  evidence indicating meager job prospects, (vi) who has not presented concrete evidence from which the Court can, with any degree of certainty, discern her current financial condition, (vii) who has not presented clear evidence of any concerted efforts to maximize her income and minimize her expenses, (viii) who wants to work for just 10 more years (to age 58), (ix) who stopped opening mail regarding her student loan obligation, and (x) who has plainly stated that she "wants her student loan debt to be over," has met her burden of establishing undue hardship so as to receive a discharge of her student loan obligation? Measured against the standard set forth in *Brunner*, the answer is no. While there are cases that warrant the discharge of student loan debt under *Brunner* "as it was originally intended", this is not one of them. The Second Circuit could not have intended that on the record placed before this Court, plaintiff is entitled to a discharge of her student loan debt

based on undue hardship. With this in mind, the Court now turns to a discussion of each prong of the *Brunner* test.

    1.  Minimal Standard of Living

Under the first prong of the *Brunner* test, a debtor must show that he or she cannot, based on current income and expenses, maintain a "minimal" standard of living if forced to repay student loan debt. "The first element requires a debtor to show that if the debtor, based on current finances, is required to make the monthly student loan payment, the debtor's standard of living will fall below a minimal level." *Thoms v. Educ. Credit Mgmt. Corp.* (*In re Thoms*), 257 B.R. 144, 148 (Bank. S.D.N.Y. 2001) (internal quotations and citations omitted). "To evaluate this element, the [C]ourt must review current income and expenses considering the particular circumstances of the case." *Id.* (citations omitted).

To meet this standard, a debtor need not "live a life of abject poverty, but it does require 'more than a showing of tight finances.'" *Johnson v. Sallie Mae Inc. (In re Johnson)*, 550 B.R. 874, 879 (Bankr. M.D. Ala. 2016) (quoting *McLaney v. Ky. Higher Educ. Assistance Auth. (In re McLaney)*, 375 B.R. 666, 674 (M.D. Ala. 2007)). *See also In re L.K.*, 351 B.R. 45, 53 (Bankr. E.D.N.Y. 2009); *Clavell*, 611 B.R. at 516 ("[A] 'minimal standard of living' does not require that the debtor live in poverty."); *Bene v. Educ. Credit Mgmt. Corp. (In re Bene)*, 474 B.R. 56, 68-69 (Bankr. W.D.N.Y. 2012) ("Clearly the Second Circuit did not equate 'minimal standard of living' with 'poverty.' The Circuit unequivocally held that committing a debtor 'to a life of *poverty*' for an extended time into the 'ten-year loan repayment period' would constitute a hardship that is 'undue.'"); *Mosley v. General Revenue Corp. (In re Mosley)*, 330 B.R. 832, 841 (Bankr. N.D. Ga. 2005) (emphasis in original), *aff'd*, 494 F.3d 1320 (11th Cir. 2007); *Faish*, 72 F.3d at 306. Nevertheless, "[a] debtor must demonstrate financial circumstances that [go] beyond the 'garden-variety financial hardship' that most debtors experience." *Jean-Baptist v. Educ. Credit Mgmt. Corp. (In re Jean-Baptiste)*, 584 B.R. 574,

587 (Bankr. E.D.N.Y. 2018) (quoting *Wolph v. U.S. Dept. of Educ. (In re Wolph)*, 479 B.R. 725, 729 (Bankr. N.D. Ohio 2012)). *See also Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 317 (Bankr. S.D.N.Y. 2002). "While it is not the Court's role to impose, *ad hoc*, a certain standard of living on the debtor, or to author his budget, the Court is required to 'review the reasonableness of the Debtor's budget — particularly the allocation of projected expenses in relation to projected income as it determines his capabilities to pay the instant obligations without undue hardship.'" *Lozada v. Educ. Credit Mgmt. Corp.* (*In re Lozada*), 594 B.R. 212, 222 (Bankr. S.D.N.Y. 2018) (emphasis in original), *aff'd*, 604 B.R. 427 (S.D.N.Y. 2019) (quoting *Pincus*, 280 B.R. at 317).

When applying this prong of the *Brunner* test, courts focus on a debtor's household income and expenses to determine what expenses are necessary for the debtor to meet her basic needs, such as food, shelter, clothing, transportation and medical treatment for herself and any dependents before repaying student loan debt. *Pincus*, 280 B.R. at 318. Additionally, courts consider whether a debtor has sought to maximize her ability to earn adequate income to pay for expenses and student loans while minimizing certain discretionary expenses. *Id.* (finding the debtor failed to demonstrate an inability to maintain a minimal standard of living where the debtor lives a comfortable lifestyle that is above the debtor's means such as paying for gym membership when a free gym was available at work, eating out and paying for newspapers, and does not evince efforts to minimize certain discretionary expenses); *Burton v. Educ. Credit Mgmt. Corp. (In re Burton)*, 339 B.R. 856, 870-71 (Bankr. E.D. Vir. 2006) (finding that courts must look at the debtor's income and expenses to determine what is the minimally necessary amount to ensure that the debtor's needs, such as food, shelter, clothing, and medical treatment are met and then look to see whether the debtor has additional funds to make student loan repayments). A minimally necessary standard of living means living "within the strictures of a frugal budget in the foreseeable future." *Chance v.*

*United States of America (In re Chance)*, 600 B.R. 51, 58 (Bankr. S.D. Ind. 2019) (quoting *In re Innes*, 283 B.R. 496, 504 (D. Kan. 2002)). Minimum standard of living does not mean mechanical adherence to the federal poverty guidelines, but the fact that a debtor's income falls below the poverty guidelines does provide strong support that the debtor's standard of living is minimal. *Johnson*, 550 B.R. at 880 n.4; *Mosley*, 330 B.R. at 841.

Where a debtor is eligible to enroll in an income-based repayment program, the debtor must demonstrate how she will be unable to make the limited payments required under the formula and still maintain a minimal standard of living. *Chance*, 600 B.R. at 58 (noting that a court can consider whether the debtor is able to make payments under an income-based repayment plan and still maintain a minimum standard of living); *Lewellen v. Access Group, Inc. (In re Lewellen)*, Case No. 07-31666 TEC, Adv. Proc. No. 08-3119 TC, 2010 WL 4975903, at *1 (Bankr. N.D. Cal. Dec. 1, 2010).

Based on the trial record, the Court cannot find that plaintiff presented evidence that she cannot, based on her current income and expenses, maintain both a "minimal" standard of living and repay her student loan debt. A review of plaintiff's Schedule I to her bankruptcy petition shows gross wage income of $1,205, as opposed to net income from an operating a business. [Bankr. dkt. no. 1]. Her Schedule J shows $2,220 of expenses, including monies for rent, utilities, a security alarm and vehicle insurance, leaving a monthly deficit of $1,015. [Bankr. dkt. no. 1]. However, the income and expenses set forth in plaintiff's bankruptcy schedules and her trial testimony do not present a clear picture of plaintiff's current finances.

As a self-employed practitioner, plaintiff's monthly income fluctuates from month to month and from year to year. According to plaintiff's Federal income tax returns, plaintiff generated gross revenues of $8,867 in 2012, $1,075 in 2013, $34,231 in 2014, $29,431 in 2015, and $14,152 in 2016. She testified that in 2017 her practice grosses about $1,000 to $1,200 a month, which would equate to $12,000 to $14,000 for 2017. According to plaintiff's tax

returns, much of plaintiff's expenses are deducted from her gross revenue from operating her law practice as business expenses as reflected in Schedule C (Profit or Loss From Business) to her Federal income tax returns because she uses her residence as an office and some of her expenses are also business-related, such as her telephone landline, internet access, and her utilities.

For the 2016 tax year, plaintiff was married but filed her tax returns separately from her husband. Plaintiff's Schedule C to her 2016 Federal income tax return shows gross receipts of $14,152. [Ex. D]. On her tax return, plaintiff took an $8,000 deduction for rent (at trial, plaintiff testified that although she did not pay rent to her mother, she paid about $700 per month toward payment of the real estate taxes) and a $2,100 deduction for utilities. Plaintiff also deducted $1,591 for legal and professional services. Additionally, she deducted $150 for advertising, although she testified that she cannot afford to pay for advertising. She also deducted $485 for insurance other than health insurance, $500 for office expense, $630 for repairs and maintenance and $375 for taxes and licenses. Her business expenses totaled $13,831, which result in a net profit of $321 for 2016.

Whatever expenses plaintiff did not deduct on her Schedule C as a business expense, plaintiff claimed an employee reimbursement on her 2016 Federal income tax return. The Employee Business Expenses form attached to the tax return shows a vehicle expense of $2,700, $40 for parking fees and tolls, $1,680 for travel expense away from home as an employee, and $1,750 of unreimbursed business expenses. She also included $800 of unreimbursed meals and entertainment from her business. Plaintiff's unreimbursed employee business expenses totaling $6,580 was reported in plaintiff's Schedule A (Itemized Deductions) to her 2016 Federal income tax return and deducted from plaintiff's personal income taxes. This resulted in plaintiff having no taxable income and, therefore, no taxes owed, not even self-employment taxes.

For tax year 2015, plaintiff filed a joint tax return with her husband. [Ex. E]. Plaintiff's Schedule C to the 2015 Federal tax return reflects gross receipts of $29,431 for her legal practice and deductions for advertising, rent, insurance (other than health), taxes and licenses, utilities and $4,583 in expenses for the security alarm, cellphone expenses, professional fees and dues for various organizations and CLEs (continuing legal education classes), computer expenses, and office supplies. Plaintiff did not list unreimbursed business expenses as an itemized deduction for 2015. Rather, as part of her Schedule C, she included $1,006 for car expenses, $1,785 in travel expenses, and $123 for deductible meals and entertainment. Thus, plaintiff deducted certain expenses from her business income because many of her expenses are paid through her business. This resulted in a net profit of $12,784. For 2015, plaintiff did not itemize her deductions. Rather, she claimed a standard deduction for married couples of $12,600. After including the wage income of her husband, plaintiff and her husband owed $2,413 in Federal income taxes for 2015, of which $1,806 represented plaintiff's self-employment taxes.

For the 2014 tax year, plaintiff filed a joint tax return with her husband. [Ex. F]. Plaintiff's Schedule C to her 2014 Federal income tax return shows gross receipts of $34,231 and total deductions of $16,540 for property taxes, travel, meals, utilities, advertising, insurance, supplies, cellphone, on-line expenses, professional groups, registration fees, and her security alarm. In 2014, plaintiff had a net profit of $17,691 for her business. For 2014, plaintiff did not itemize her deductions but took a standard deduction for married couples. With the wage income of her husband, plaintiff and her husband owed $3,939 in Federal income taxes that year of which $2,500 represented plaintiff's self-employment taxes.

For the 2013 tax year, plaintiff's Schedule C to her 2013 Federal income tax return shows gross receipts of $1,075 and expenses of $516, leaving a net profit of $559. [Ex. G]. Plaintiff claimed the standard deduction for 2013 as the amount of the deduction exceeded

her net profit. After deducting expenses, plaintiff's tax obligation was self-employment taxes of $79 for that year.

For the 2012 tax year, plaintiff's Schedule C to her 2012 Federal income tax return shows gross receipts of $8,867 and expenses of $2,973 for her cellphone, on-line expenses, license fees, professional groups, registration fees, review courses, supplies, meals and entertainment, and taxes, leaving net profit of $5,894. [Ex. H]. Plaintiff took a standard deduction for 2012 as the amount of the deduction exceeded her net profit, which resulted in a tax obligation for self-employment taxes of $724 for that year.

Similarly, for the 2011 tax year, plaintiff's Schedule C to her 2011 Federal tax return shows gross income of $9,568 and expenses of $3,470 representing car expenses, supplies, office expenses, taxes and licenses, and other expenses, which resulted in a net profit of $6,188. [Ex. I]. Plaintiff took the standard tax deduction and after deducting her expenses, plaintiff's tax obligation for self-employment taxes totaled $760 for that year.

Although an argument could have been made that plaintiff's tax returns show she had little disposable income after payment of her business expenses, some of plaintiff's personal expenses have already been deducted from her gross revenues because the expenses also have a business component to them. However, when these same business expenses such as rent, security alarm, telephone, cellphone, internet, and cable services are then listed in plaintiff's Schedule J to the bankruptcy petition as personal expenses, the Court cannot comfortably limit its review of plaintiff's financial condition to just her Schedules I and J. For example, if plaintiff pays her "rent" through the business, then how can she then say it is a personal expense under Schedule J that must also be deducted from her gross wages or salary as set forth in Schedule I (Question 2), which seeks to determine a debtor's wages or salary actually paid to her? Even where a debtor receives income from the operation of a business, Schedule I (Question 10) requires the disclosure of "net income" from such business, which is what the

debtor would receive after deducting business-related expenses, and any further deductions against that "net income" to arrive at the debtor's disposable income for bankruptcy purposes should only be the debtor's personal expenses. To list the same expenses on Schedule J that in the past were paid and accounted for as business expenses on prior years' tax returns distorts plaintiff's actual disposable income when such expenses appear to be deducted from plaintiff's gross wages or salary under Schedule I.

Providing information as to her current financial situation should not be a difficult task. It is required by the first prong of the *Brunner* test as the "minimum necessary" to establish undue hardship. *Brunner*, 831 F.2d at 396. It "serve[s] as the starting point . . . since information regarding the debtor's financial situation will be concrete and readily obtainable". *Matter of Robertson*, 999 F.2d 1132, 1135 (7th Cir. 1993). Here, plaintiff has not presented the Court with concrete evidence from which her current financial condition can, with any degree of certainty, be known. As such, the Court is unable to determine on the record before it what expenses listed on plaintiff's bankruptcy Schedule J must be deducted from her income listed on her bankruptcy Schedule I. How then is the Court to make a finding as to plaintiff's disposable income, and whether it allows her to both maintain a minimal standard of living and repay her student loan debt?

What is more problematic is how to accurately account for the indeterminate amount that plaintiff claims she receives throughout the year in the form of cash reimbursements for expenditures she makes on her parents' behalf for on-line or credit card purchases. Similarly, plaintiff testified that when her husband did not have access to the internet, she would make on-line purchases for him and he would reimburse her in cash or through a PayPal transfer to her checking account. Plaintiff testified that although some of the cash reimbursements from her mother and her husband may be deposited into her bank accounts, generally she would just keep the cash on hand to pay upcoming expenses. Plaintiff testified that she does

not keep track of cash she receives from her family, nor did she introduce any documentary evidence showing the expenditures she made on behalf of her family or when she received a reimbursement in whole or in part. Plaintiff's bank statements for the period from 2013 through 2017 show that plaintiff has always maintained a positive bank balance even though plaintiff stated that she rarely deposited the cash she receives from her family into her bank accounts as reimbursement for the purchases debited from the accounts. As noted above, plaintiff's use of cash reimbursements from her family to defray living expenses demonstrates that plaintiff had sufficient funds available in her bank accounts not just for her other general living expenses that were paid directly from her checking account but to make purchases for her family, such as expenses related to vacations to Disney World and gifts for her relatives, and discretionary purchases for herself. Such discretionary expenses included an Apple watch, designer purse and shoes, and numerous purchases in excess of $100 for which plaintiff had no recollection.

In short, there is no evidence in the record from which to conclude that plaintiff is suffering from tight finances, is making sacrifices with respect to discretionary expenses, is living on any sort of restricted budget, and is actively pursuing legal work or taking other steps to maximize her income.

Additionally, because plaintiff is eligible to enter the Ford Program or avail herself of options under the FFELP in order to achieve greater flexibility in repaying the ECMC Loan, plaintiff's payment obligation on the ECMC Loan would be $0 for a period of 25 years based on her reported AGI of $321, as reported in plaintiff's 2016 Federal income tax return. Therefore, it cannot be said that an obligation to pay $0 on the ECMC Loan under the income-based repayment options would cause plaintiff to fall below a minimum standard of living. *Murrell v. Edsouth (In re Murrell)*, 605 B.R. 464 (Bankr. N.D. Ohio 2019) (finding that

debtor's household income and capacity to reduce non-essential expenses would enable debtor to make the payments under an income-based repayment plan).

Based on the trial record, the Court finds that plaintiff has failed to demonstrate by a preponderance of the evidence that she would be unable to maintain a minimum standard of living if required to make payments under the ECMC Loan. Because plaintiff has not met her burden of proof as to the first prong of the *Brunner* test, the Court need not address whether plaintiff has satisfied the remaining two prongs of the *Brunner* test. However, in the interest of completeness, the Court will do so. As set forth below, based on the trial record, the Court finds that plaintiff has similarly failed to meet her burden of proof as to the second and third prong of the three-part *Brunner* test to establish that excepting her student loan debt from discharge will cause her undue hardship.

### 2.  Additional Circumstances Suggesting a Continuing Inability to Repay

"The second prong of the *Brunner* test requires a debtor to show that 'additional circumstances exist indicating that [the debtor's present economic duress] is likely to persist for a significant portion of the repayment period' for the student loans, and that inability to pay is because of factors beyond the debtor's control." *In re Lozada*, 604 B.R. 427, 436 (S.D.N.Y. 2019) (quoting *In re* Crawley, 460 B.R. 421, 438 (Bankr. E.D. Pa. 2011)). "Under this factor, debtors must demonstrate 'unique or exceptional circumstances in their current situations that would clearly limit their future abilities to earn a living, support themselves, and repay their loans.'" *Id.* (citations omitted).

In evaluating this factor, courts may consider a debtor's medical condition, disability, or responsibility for his or her dependents. *King v. Vt. Student Assistance Corp. (In re King)*, 368 B.R. 358, 370 (Bankr. D. Vt. 2007).  Courts have also considered a debtor's "assets, career, income or potential for increased career and financial opportunities", *Shenk v. U.S. Dept. of*

*Educ.* (*In re Shenk*), 603 B.R. 671, 680 (Bankr. N.D.N.Y. 2019) (internal citations omitted), and whether a debtor has maximized her income potential, has more lucrative job skills, has limited working years left, and whether there are factors that would prevent the debtor from retraining or relocating, *Turturo v. Access Group, Inc. (In re Turturo)*, 522 B.R. 419, 427 (Bankr. N.D.N.Y. 2014) (finding that a 31-year old, consumer bankruptcy attorney had no impairment to preclude his ability to work and no dependents and, with appropriate application and study, could expand to more lucrative areas of practice). *See also Johnson*, 550 B.R. at 880 (finding that the debtor's ability to repay a student loan is not insurmountable even though the debtor lacks a college degree and, at 52 years of age, had limited working years left when the debtor was still in good health).

Where a debtor claims to suffer from a medical or mental condition, the debtor must "precisely identify her problems and explain how her condition would impair her ability to work in the future." *Trudel v. U.S. Dep't of Educ. (In re Trudel)*, 514 B.R. 219, 226 (B.A.P. 6th Cir. 2014) (quoting *Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005)). The debtor must demonstrate "a strong nexus between the medical condition and its adverse effect on the debtor's terms of employment (specifically, a debtor's income)". *Trudel*, 514 B.R. at 226 (quoting *Morrow v. U.S. Dep't of Educ. (In re Morrow)*, 366 B.R. 774, 778 (Bankr. N.D. Ohio 2007)). A debtor's testimony alone is not sufficient to show that the debtor has a limited physical capacity and diminished employment prospect. *Lozada*, 604 B.R. at 436-37. Courts require substantial credible evidence that corroborates a debtor's testimony regarding the nexus between a medical or mental condition and the debtor's inability to earn enough income to repay the educational loan. *Traversa*, 444 F. Appx. at 474-75 (finding debtor failed to prove his alleged medical condition would render him unable to repay his loans over the repayment period when the documentary evidence contained no information about his medical condition); *Gesinde v. U.S. Dep't. of Educ. (In re Gesinde)*,

Case No. 18-10320 (SHL), Adv. No. 18-01434 (SHL), 2019 WL 5090080, at *6 (Bankr. S.D.N.Y. Oct. 10, 2019) (declining to consider debtor's medical conditions where debtor failed to provide an assessment from a medical professional).

Although plaintiff stated that she has "chronic issues" and had knee replacement surgery, she did not explicitly ask that her "chronic issues" or her knee replacement surgery be taken into consideration in determining whether her student loan obligation should be discharged. Further, plaintiff did not testify to, nor did she present any corroborating evidence of, any continuing, underlying medical condition that she suffers from that would interfere with her daily activities, including the practice of law. To the contrary, plaintiff testified that she can shovel snow and, while she said that she cannot earn income by waiting tables because she would be required to be constantly on her feet, her "chronic issues" do not preclude her from engaging in other occupations, including her current one as an attorney. Additionally, the trial record shows that plaintiff is capable of driving, traveling and working, all without issue due to her unspecified chronic issues.

Plaintiff states that she was employed by the law firm Fratello & Fox P.C. as a legal assistant and, upon graduation from law school in 2006, as a lawyer. She worked at the law firm until the middle of June 2011 and opened her own law practice in October 2011. She testified that while at the firm, she would be laid off at times, albeit temporarily, when the firm's legal work slowed down or the attorney whom she worked for had her daughters handle nonlegal tasks. This, however, relates only to plaintiff's past employment history with a single law firm and is not indicative of what transpired after plaintiff opened her own law practice. While plaintiff does not foresee how her current financial situation will change in the next ten years, she has not demonstrated that she cannot earn higher income, or that she is not capable of generating any more revenue. Plaintiff does not lack usable or marketable job skills. Plaintiff mainly receives her business by word of mouth. She did not provide any

testimony or documentary evidence showing any effort to increase her current business base or whether she has actively pursued a position with a law firm to obtain a steady income. Although Plaintiff testified that she cannot afford advertising for her practice, she has taken a tax deduction for advertising and apparently has the discretionary income to advertise her business. As a self-employed individual, plaintiff's own financial future is within her control in terms of how much business she wishes to actively pursue, how many hours she wishes to work each week, and how much she decides to charge for her legal services. As plaintiff's own tax returns demonstrate, her revenue fluctuates from year to year. The trial record in this case does not reveal any impediment to plaintiff's ability to generate more revenue from her business nor any reason why plaintiff should be discharged of her obligation to repay any portion of her student loan obligation, even at a reduced monthly payment, should her earnings increase for a particular year.

Plaintiff's only other "additional circumstance" focuses on her age and the purported number of years left in her working life. Plaintiff was 48 years old at the time of trial and she contends that she intends on working for just 10 more years. While having a goal of retiring at age 58 is a worthy pursuit, plaintiff has not presented any evidence to demonstrate that she is incapable of working beyond age 58. Courts have rejected arguments that age alone satisfies the second prong of the *Brunner* test. *Chance*, 600 B.R. at 59 (rejecting age as a factor where the debtors are in their late fifties); *Tuttle v. Educ. Credit Mgmt. Corp. (In re Tuttle)*, 600 B.R. 783, 801 (Bankr. E.D. Wis. 2019) (rejecting argument that 46 years of age is an "exceptional circumstance" equating to unemployability and a persistent inability to pay). The fact that repayment of plaintiff's student loan obligation will last into her later years in life is a by-product of plaintiff's choice to obtain her law degree in her mid-30's, and it is not a unique or exceptional circumstance that is beyond plaintiff's control. *Little v. U.S. Dep't. of Educ. (In re Little)*, 607 B.R. 853, 861 (Bankr. N.D. Tex. 2019). Plaintiff's argument

that she should be freed of her student loan obligation because she has arbitrarily decided to cease working at age 58 is not sufficient to demonstrate an inability to repay her student loan obligation over an extended period of time.

Under the second prong, a debtor must show circumstances that are "strongly suggestive" of a "continuing inability to repay over an extended period of time." *Brunner*, 831 F.2d at 396. Plaintiff has failed to make that showing here. As noted above, plaintiff is 48 years old, in good health, with no dependents, with a solid education, including a law degree, and she is gainfully employed. While plaintiff argues that she has a continuing inability to repay her student loan obligation, the evidence at trial suggests otherwise. Accordingly, the Court finds that plaintiff has not satisfied her burden of proving by a preponderance of the evidence that she meets the second prong of the *Brunner* test.

### 3. Good Faith

The third prong of the *Brunner* test considers whether "the debtor has made good faith efforts to repay the loans." *Brunner*, 831 F.2d at 396. Courts look to factors such as a debtor's "efforts to obtain employment, maximize income and minimize expenses, and to undertake all other reasonable efforts to ensure repayment." *Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 420 (Bankr. E.D.N.Y. 2004) (citation omitted); *Pincus,* 280 B.R. at 316. Repayment efforts can include (1) actual payments made on the loans and (2) attempts by the debtor to seek alternative remedies to discharge, such as deferment of payment. *Pincus,* 280 B.R. at 316. While courts in the Second Circuit do not have a *per se* rule that a debtor's decision to forego an alternative prepayment plan establishes bad faith, courts do consider whether a debtor negotiated or enrolled in an alternative repayment plan as one of the factors for determining good faith efforts. *Benjumen v. AES/Charter Bank (In re Benjumen)*, 408 B.R. 9, 23-24 (Bankr. E.D.N.Y. 2009). *See also Roth v. Educ. Credit. Mgmt. Corp. (In re Roth)*, 490 B.R. 908 (B.A.P. 9th Cir. 2013) (court will consider a debtor's effort or

lack thereof to negotiate a repayment plan but failure to negotiate or accept an alternative repayment plan is not dispositive.).

Aside from the debtor's repayment history, courts also consider whether the debtor's inability to pay was due to circumstances beyond the debtor's control as opposed to lifestyle choices. *Johnson*, 550 B.R. at 881 (finding the absence of good faith where the debtor failed to explain why she purchased a new car when her old car experienced mechanical issues and failed to make higher payments on her student loans when she had the financial wherewithal to increase the amount of her payments). "[T]he debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." *Lozada*, 604 B.R. at 437 (quoting *Pobiner*, 309 B.R. at 420). *See also Faish*, 72 F.3d at 305; *Benjumen*, 408 B.R. at 22. "[A] debtor may not avail himself of [ ] § 523(a)(8) if he is responsible for causing the undue hardship." *Pincus*, at 316.

The only evidence that plaintiff points to regarding her repayment history is her testimony that she repaid a total of $5,000. However, plaintiff only found a single record for one payment of $500, and her testimony that she paid a total of $5,000 is based on the interest deduction she took on her tax returns for student loan repayments. There is no independent or specific evidence in the record that conclusively shows that plaintiff repaid a total of $5,000. Additionally, the last time plaintiff recalls making a payment was in 2010 or 2011. Plaintiff testified that she sought deferments and forbearance on payment of her student loan obligation from the time after she graduated law school until she was no longer able to put off repayment of her loans.

As noted above, there is no evidence in the record that plaintiff tried to maximize her income and economize in order to make payments on her student loan obligations. The trial record shows that plaintiff's legal work comes by referrals, and not by any design of how best to generate business in her practice area. The trial record also shows that plaintiff's checking

account statements reflect various discretionary expenses and purchases in excess of $100 for which plaintiff had no recollection. Plaintiff did not offer any evidence that she has tried to minimize her expenses, and the record placed before the Court shows that she had income in excess of expenses that she could have applied toward repayment of her student loan obligation, at least in part. Additionally, plaintiff chose to attend a conference on international law in Montreal in order to satisfy continuing legal education requirements. Although plaintiff testified that she attended the conference because of an interest in international law, there is no evidence in the trial record that plaintiff has sought to expand her practice to include international law. No reason was given as to why plaintiff could not have found an international law conference within the United States or even in nearby New York City at a lesser cost.

Good faith can be demonstrated where a debtor directs some of her discretionary funds, even if a nominal amount, to pay down the student loans. *In re Shenk*, 603 B.R. at 681. Contrary to plaintiff's testimony that she would pay her student loans whenever she had spare cash to do so, the trial record shows that plaintiff used excess funds for own personal enjoyment or for gifts. The funds plaintiff has on hand in her bank accounts each month is a product of plaintiff's own lifestyle choices and not a result of any effort by her to economize. No evidence was proffered that after accounting for expenses necessary to sustain a minimal standard of living, which would include expenses for shelter, food, transportation, medical and dental expenses, and a reasonable amount for recreation and entertainment, plaintiff sought to limit her discretionary expenses so as to allow for repayment of her student loan obligations.

Other than requesting deferments and forbearance arrangements, plaintiff did not seek to enroll in any alternative repayment programs. While plaintiff is not required to enter into an income-based repayment program, her basis for declining to pursue such an option,

where her future monthly payment under any of the program options would be $0 based upon her 2016 income, is simply the inconvenience of having to report her income annually for 25 years. Plaintiff's unwillingness to be inconvenienced by having to report her annual income for the next 25 years does not provide sufficient justification to discharge her student loan obligation. The courts have found that a debtor's refusal to enter into a reduced loan repayment plan that allows her to remain at her preferred job and maintain her current level of expenditures merely because a debtor wants to retire by a certain age and obtain a fresh start at saving for retirement is "simply shorthand for [a debtor's] lack of interest in repaying the debt." *Augustin v. U.S. Dep't of Educ. (In re Augustin)*, 588 B.R. 141, 153-4 (Bankr. D. Md. 2018) (quoting *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 403 (4th Cir. 2005)).

Further, it is difficult to find good faith based on a record which shows that plaintiff did not even bother to open mail she received regarding her student loan obligations, and plainly states that she just "wants her student loan debt to be over."

Accordingly, based on the record placed before it, the Court concludes that plaintiff has not established that she made good faith efforts to repay her student loan obligation to ECMC. As such, plaintiff has not satisfied her burden of proving by a preponderance of the evidence that she meets the third prong of the *Brunner* test.

## CONCLUSION

For the foregoing reasons, plaintiff has failed to demonstrate that she is entitled to a discharge of her student loan debt to ECMC. Accordingly, the Court grants judgment in favor of ECMC dismissing the complaint as against ECMC. ECMC is directed to settle a judgment in accordance with this decision, on no less than five business days' notice to all parties in

interest.

It is so ORDERED.



**Dated: April 24, 2020**
**Central Islip, New York**

_Louis A. Scarcella_
**Louis A. Scarcella**
**United States Bankruptcy Judge**